174 P.3d 659 (2007)
In the Matter of the Marriage of Michael Steven KING, Respondent,
v.
Brenda Leone KING, Petitioner.
No. 79978-4.
Supreme Court of Washington, En Banc.
Argued May 31, 2007.
Decided December 6, 2007.
*661 Kathleen M. O'Sullivan, Rebecca S. Engrav, Perkins Coie LLP, Nicholas Peter Gellert, Attorney at Law, Seattle, WA, for Appellant.
Bradley K. Crosta, Attorney at Law, Kenneth G. Christensen, Office of Ken Christensen, Seattle, WA, for Respondent.
Jeffrey Todd Even, Office of The Attorney General, Olympia, WA, for Amicus Curiae Attorney General of State of Washington.
Raven Clarke Lidman, Seattle University Law Clinic, Seattle, WA, Martha F. Davis, Northeastern School of Law, Boston, MA, for Amicus Curiae International Law School.
Vanessa Soriano Power, Stoel Rives LLP, Seattle, WA, Debra Gardner, Janet Hostetler, Public Justice Center, Baltimore, MD, Clare Pastore, Los Angeles, CA, Russell Engler, Boston, MA, for Amicus Curiae National Coalition for a Civil Right to Counsel.
Raegen Nicole Rasnic, Skellenger Bender PS, Seattle, WA, for Amicus Curiae Northwest Women's Law.
Fredric Tausend, Kirkpatrick & Lockhart Preston Gates Ellis, Seattle, WA, David S. Udell, Laura K. Abel, Brennan Center for Justice, Sidney S. Rosdeitcher, Michael N. Berger, Paul, Weiss, Rifkind, New York, NY, for Amicus Curiae Retired Washington State.
Pamela Beth Loginsky, Washington Assoc. of Prosecuting Atty., Olympia, WA, for Amicus Curiae Washington State Association of Counties.
Robert Dean Welden, Washington State Bar Association, Marvin Lee Gray, Jr., Davis Wright Tremaine LLP, Seattle, WA, for Amicus Curiae Washington State Bar Association.
Erik DuPen Price, Lane Powell PC, Olympia, WA, for Amicus Curiae Washington State Legislature.
C. JOHNSON, J.
¶ 1 This case involves the issue of whether an indigent parent has a constitutional right, primarily under the Washington State Constitution, to appointment of counsel at public expense in a dissolution proceeding. The constitutional claims are primarily based on article I, section 3, article I, section 10, and article I, section 12 of the Washington State Constitution. During a five day trial, the petitioner, Brenda King, acted pro se and the respondent, Michael King, was represented by counsel. At the trial's conclusion, the superior court entered a parenting plan granting primary residential care of the children to the father-respondent. The plan granted visitation rights to the petitioner-mother. The petitioner then obtained assistance of counsel and filed a motion for a new trial, a motion that the trial judge denied. We granted direct review of that decision and affirm.

FACTS
¶ 2 Brenda and Michael King were married for approximately 10 years and had three children. During the marriage, the petitioner was the primary at-home caregiver for their children. In September 2004, the parties separated and the respondent filed for dissolution of the marriage. He sought to become the primary residential parent for their three children.
¶ 3 The respondent was represented throughout the proceedings by private counsel. While the petitioner had counsel for part of the proceedings, at trial she was unrepresented and proceeded pro se.
¶ 4 The trial court awarded the respondent primary residential care of the children and decision-making authority. The petitioner was awarded unsupervised visitation time on alternating weekends, four weeks of vacation each summer, and school spring break in odd numbered years. She also received authority to make day to day decisions when the children were with her and reasonable telephone contact. Clerk's Papers (CP) at 250-52, 254-56.
¶ 5 Following trial, Ms. King obtained counsel. The attorney appeared and moved for a new trial and requested that counsel be appointed, at public expense, to represent King.[1] The superior court denied the motion. *662 The court explained that the legislature had not provided funding for counsel. The court also cited its lack of authority to appoint an attorney without compensation. Ms. King appealed. We granted direct review.[2]

ANALYSIS
¶ 6 Before proceeding to an analysis of the constitutional claims presented, it is necessary to define the nature of the interest implicated in this case. Defining or determining the interest involved will guide the constitutional analysis and determination.
¶ 7 The petitioner claims her fundamental parental liberty interest is at stake in a dissolution proceeding and that the court order deprives her of the care, custody, companionship, and control of her children. To support her argument, petitioner relies on, and cites to, several of our cases for support. In In re Welfare of Luscier, 84 Wash.2d 135, 524 P.2d 906 (1974), we held that in the context of a state instituted parental termination proceeding, indigent parents possess a due process right to appointment of counsel at public expense. We recognized the fundamental nature of the parent-child relationship, a relationship that was entitled to constitutional significance. Later, in In re Welfare of Myricks, 85 Wash.2d 252, 533 P.2d 841 (1975), we extended this reasoning to state instituted dependency proceedings.[3] The petitioner claims her constitutional interests in a dissolution proceeding involving custody are no less significant than those recognized under Luscier and Myricks.
¶ 8 The respondent argues that a dissolution proceeding is a private dispute in which, under the controlling statutes, the court enters a parenting plan dividing the residential placement of the children. The result is an arrangement in which the rights and obligations of parenting are shared between the parents. Respondent maintains that under the statutory scheme, no deprivation of fundamental parental rights takes place that would warrant application of full procedural due process protections. The respondent points to In re Dependency of Grove, 127 Wash.2d 221, 897 P.2d 1252 (1995), in which we held that where fundamental constitutional rights are not threatened, no right to counsel exists at public expense. He argues that shared custody is fundamentally different from permanent deprivation of parental rights and that any decision concerning the appointment of counsel at public expense must be left to the legislature. The respondent further points out that no cases exist that extend a constitutional right to the appointment of counsel at public expense under these circumstances.
¶ 9 In Luscier, we reviewed a superior court order that denied an indigent parent the appointment of appellate counsel to challenge an order previously entered permanently depriving the parent of all parental rights and interests. After surveying and analyzing prior case authority, we recognized a parent's interest in the custody and control of their children as an essential right entitled to full due process safeguards, including appointment of counsel at public expense. Our *663 holding was supported by similar cases from other states, which had held appointment of counsel was constitutionally mandated in permanent deprivation proceedings.
¶ 10 In Myricks, we applied similar reasoning to require appointment of counsel in state instituted dependency and neglect proceedings where, although the child was temporarily removed from the home, the likelihood of permanent deprivations was substantial. In Myricks, as in Luscier, we recognized the fundamental nature of parental rights at issue in the dependency proceedings. We also noted the fact that the indigent parent faced the superior power of state resources in the proceedings.
¶ 11 Dissolution proceedings are generally a private action between spouses resulting in termination of the marriage. Where the parties have children, the proceedings will also involve a decision on where the children will primarily live and how, among other things, parents will share placement time with the children. The legislature has provided that the best interests of the children is ordinarily served when the preexisting "pattern of interaction between a parent and child is altered only to the extent necessitated by the changed relationship of the parents. . . ." RCW 26.09.002. What this policy promotes is the continued parental involvement in the children's lives to the greatest extent possible, given the dissolution of the marriage.
¶ 12 The entry of a parenting plan effectuating the legislative purpose of continued parental involvement in the children's lives does not equate to an action where the State is seeking to terminate any and all parental rights and parental involvement with the children, severing the parent-child relationship permanently. As the amicus brief of Washington State Attorney General Robert M. McKenna points out, a dissolution proceeding is fundamentally different from termination or dependency proceedings. The dissolution proceeding is a private civil dispute initiated by private parties to resolve their legal rights vis-a-vis each other and their children. When children are involved in the marriage, entry of a parenting plan is a statutory requirement. RCW 26.09.050(1). Entry of such a parenting plan does not terminate the parental rights of either parent, but rather allocates or divides parental rights and responsibilities in such a way that they can be exercised by parents no longer joined in marriage.[4] Even where a parenting plan results in a child spending substantially more, or even all, of the child's time with one parent rather than the other, both parents remain parents and retain substantial rights, including the right to seek future modification of the parenting plan. See RCW 26.09.260. As such, the parenting plan divides parental roles and responsibilities, rather than terminating the rights of either parent.
¶ 13 Furthermore, the State's involvement is meaningfully different. The proceeding is not instituted by the State. The State is not a party to the proceedings with regard to determining the manner in which parental rights are divided under the parenting plan, nor does the State seek custody of any children or any rights with respect to the child. See Amicus Br. of Wash. State Att'y Gen. at 5-6. We agree with the attorney general's reasoning. The outcome of a dissolution proceeding cannot be equated with a dependency or termination proceeding.
¶ 14 We hold that Luscier and Myricks do not support the petitioner's argument. The interest at stake here is not commensurate with the fundamental parental liberty interest at stake in a termination or dependency proceeding. While a parent's interest in the provisions of a parenting plan is significant, that interest is less than those interests in a termination or dependency proceeding and must be analyzed as such. Further, the State's role in a dissolution action is not comparable to its role in a termination or dependency proceeding. The cases establishing a right to counsel mention and rely on the fact that the full resources of the State are brought to bear in termination and dependency proceedings. That concern does not exist in dissolution actions. The petitioner's fundamental parental liberty interest, *664 recognized in termination proceedings, is not at stake here.[5]
¶ 15 In addition, we recognize that while parenting plan statutes focus on the best interests of the children, RCW 26.09.002, they also provide protections for both parents from erroneous decisions.[6] These safeguards include, where the court deems appropriate, the appointment of an attorney to represent the children's interests at public expense when the parties are indigent. RCW 26.09.110. Additionally, the trial court may seek the advice of professional personnel concerning the provisions of a parenting plan. RCW 26.09.210. The court may also appoint a guardian ad litem (GAL) for the purpose of preparing an investigation and report concerning parenting arrangements. RCW 26.09.220. The GAL is provided at public expense where both parents are indigent. RCW 26.12.175(1)(d). In counties where a unified family court is established, state law authorizes the appointment of court facilitators "to provide assistance to parties with matters before the unified family court." RCW 26.12.802(3)(d). Where no parental indigency exists, the court has the authority, in appropriate cases, to shift expenses between the parties, somewhat equalizing the resources available to both parents. RCW 26.09.140. Hence, statutory provisions advance the best interests of the child and also provide protections for both parents from erroneous decisions.
¶ 16 Though we determine that fundamental constitutional rights are not implicated in a dissolution proceeding, we address the petitioner's constitutional claims. The interests, while not fundamental, are significant enough to analyze the constitutional claims.
Article I, section 10
¶ 17 Ms. King argues that she has a right to publicly funded counsel under three provisions of the Washington State Constitution: article I, section 3, article I, section 10, and article I, section 12.[7] We turn first to Ms. King's argument that she is entitled to appointed counsel under article I, section 10. We have generally applied the open courts clause in one of two contexts: "the right of the public and press to be present and gather information at trial and the right to a remedy for a wrong suffered." Robert F. Utter & Hugh D. Spitzer, The Washington State Constitution: A Reference Guide 24 (2002); see, e.g., State v. Easterling, 157 Wash.2d 167, 137 P.3d 825 (2006) (the right to open and accessible court proceedings); Dreiling v. Jain, 151 Wash.2d 900, 93 P.3d 861 (2004) (defendant's right to a public trial); Doe v. Puget Sound Blood Ctr., 117 Wash.2d 772, 780, 819 P.2d 370 (1991) (the right to discovery).
¶ 18 Ms. King argues that the right of access is violated by less than meaningful access, citing Tennessee v. Lane, 541 U.S. 509, 533, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004), and Bullock v. Roberts, 84 Wash.2d 101, 524 P.2d 385 (1974). Ms. King asserts that the right of access is violated when (1) the proceeding is adversarial; (2) crucial interests are at stake; (3) the unrepresented litigant is indigent and has made reasonable, but unsuccessful, efforts to obtain counsel; *665 and (4) the unrepresented litigant is unable to adequately or effectively advocate for his or her interests. Br. of Appellant at 25.
¶ 19 In Lane, the United States Supreme Court considered whether Congress had the power under section 5 of the Fourteenth Amendment to the United States Constitution[8] to enact Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12131-12165. The respondents, George Lane and Beverly Jones, filed suit against the State of Tennessee and a number of its counties. They alleged that they were denied physical access to, and the services of, the state court system by reason of their disabilities. Both were paraplegics who relied on wheelchairs. When Lane first appeared to defend a criminal charge, he had to crawl up two flights of stairs. At a second hearing, he refused to crawl or be assisted and was arrested and jailed for failure to appear. Jones, a certified court reporter, claimed to have lost job opportunities because certain courthouses were inaccessible. Lane, 541 U.S. at 513-514, 124 S.Ct. 1978.
¶ 20 The United States Supreme Court found that the volume of evidence demonstrating unconstitutional discrimination was sufficient to justify Congress' exercise of its prophylactic power.[9] The Court referred to "the right of access to the courts at issue in this case" as a "basic right[]," calling for a standard of judicial review at least as searching as that applicable to sex-based classifications. Lane, 541 U.S. at 529, 124 S.Ct. 1978. The Court said that "ordinary considerations of cost and convenience alone cannot justify a State's failure to provide individuals with a meaningful right of access to the courts." Lane, 541 U.S. at 533, 124 S.Ct. 1978.[10]
¶ 21 The petitioner further argues, citing Bullock, that what she seeks is part of a "fundamental" right of access. In Bullock, four petitioners, each an indigent plaintiff in a divorce action, sought an order from the presiding judge of the King County Superior Court. That order would have resulted in a waiver of the clerk's fee for filing. The petitioners also sought to have the presiding judge compel the sheriff to make service of process without fee.
¶ 22 On appeal, we noted that it is within the inherent power of a court exercising common law jurisdiction to make such orders as are necessary to protect the rights of the poor to access to the judicial system. We granted a writ of mandamus ordering the presiding judge to exercise discretion "consistent with the facts" in deciding when and how to waive costs. Bullock, 84 Wash.2d at 104, 524 P.2d 385. We found that "[f]ull access to the courts in a divorce action is a fundamental right." 84 Wash.2d at 104, 524 P.2d 385 (citing Boddie v. Connecticut, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971)).
¶ 23 The mere fact that "access" is a linguistically broad term does not bring the petitioner's inability to obtain counsel within the authority of Lane and Bullock. The Court in Lane was dealing with physical barriers to access and services, barriers that were effectively imposed by the State in that case. References to "meaningful" access in Lane should be read in that light: the incongruity of a right of access that is all but denied by physical obstacles. In Bullock, the barrier to "access" was court-imposed fees. It is more than an insignificant linguistic leap *666 to equate that barrier to access with a right to publicly funded legal representation.[11]
¶ 24 Neither Bullock nor Lane are authority for so broadly expanding the reach of article I, section 10. When interpreting a reference to "open courts" in its state constitution, the Connecticut Supreme Court found that the provision "was `never intended to guarantee the right to litigate entirely without expense to the litigants. . . .'" Doe v. Connecticut, 216 Conn. 85, 98, 579 A.2d 37 (1990) (quoting In re Lee, 64 Okla. 310, 312, 168 P. 53 (1917)). We similarly find no basis for reading article I, section 10 to provide this right under these circumstances.
Article I, section 3
¶ 25 We turn next to Ms. King's assertion that a right to counsel is a function of due process. Both the Fourteenth Amendment to the United States Constitution as well as article I, section 3 require the State to provide due process before depriving an individual of fundamental liberty interests.
¶ 26 Ms. King asserts that article I, section 3 is more protective of the civil right to counsel than the federal constitution, as evidenced by the analysis and results of the Washington cases establishing the right to counsel in termination and dependency actions.[12]See Luscier, 84 Wash.2d 135, 524 P.2d 906; Myricks, 85 Wash.2d 252, 533 P.2d 841.[13] The United States Supreme Court found that the federal Constitution does not require appointment of counsel in every parental termination proceeding. Lassiter v. Dep't of Soc. Servs., 452 U.S. 18, 31, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981).
¶ 27 Six factors govern the question whether a state constitutional provision extends broader rights than the federal constitution. State v. Gunwall, 106 Wash.2d 54, 720 P.2d 808 (1986). They are (1) the textual language of the state constitution, (2) significant differences in the texts of parallel provisions, (3) state constitutional history, (4) preexisting state law, (5) structural differences between the federal and state constitutions; and (6) matters of particular state interest and local concern.
¶ 28 As to the first and second factors, since the language of the state and federal provisions is identical, neither is helpful.[14] *667 Regarding the third and fourth factors, Ms. King argues that the common law provided for a right to counsel and the common law was incorporated into Washington law. She argues that at common law, some indigent litigants in civil cases were entitled to the assistance of counsel without charge, citing 11 Hen. 7, c. 12 (1494). Washington recognized common law principles when it became a state. RCW 4.04.010.
¶ 29 While some indigent litigants were entitled to counsel under the common law, we find no authority extending that right to dissolution proceedings. Furthermore, some courts have concluded that the law did not provide for publicly funded counsel, but instead obligated attorneys to provide free service. See, e.g., Bristol v. United States, 129 F. 87, 88 (7th Cir.1904). Preexisting state law and constitutional history do not support her argument.
¶ 30 Turning to the fifth factor, Ms. King argues that the structure of the Washington Constitution points toward it being more protective of individual rights than its federal counterpart. Br. of Appellant at 36 (citing State v. Foster, 135 Wash.2d 441, 458, 957 P.2d 712 (1998)). We have consistently concluded that this factor supports an independent analysis.
¶ 31 Finally, Ms. King argues the sixth factor, matters of particular state interest and local concern, favors independent analysis. She argues that the strong history of state variation in court procedure and deference to state policy-making regarding the right to counsel indicate that this is a matter of more local than national concern. Even applying a more protective scope under article I, section 3, we conclude the need for independent analysis does not extend to the circumstances here.
¶ 32 Other courts have similarly concluded that there is no due process right to counsel in the context of a case like this one. Under federal law, the right to counsel attaches only where physical liberty is at stake, unless a different result is necessary under the balancing test set out in Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). State courts that have considered the matter have likewise concluded that there is no right to counsel at taxpayer expense in a dissolution action. See, e.g., Poll v. Poll, 256 Neb. 46, 52, 588 N.W.2d 583 (1999), overruled in part on other grounds by Gibilisco v. Gibilisco, 263 Neb. 27, 637 N.W.2d 898 (2002); Harmon v. Harmon, 943 P.2d 599, 605 n. 5 (Okla.1997); State ex rel. Ondracek v. Blohm, 363 N.W.2d 113, 115 (Minn.Ct.App.1985).
¶ 33 Ms. King argues that she is entitled to counsel under article I, section 3. Ms. King claims that under this standard, counsel was required because two fundamental rights were at stake: the right of access to the courts[15] and Ms. King's parenting rights. Even if we were to assume that an independent analysis applies to her article I, section 3 claim, we hold Ms. King is not entitled to counsel.
¶ 34 Under Myricks, whether counsel must be appointed depends on the nature of the rights in question and the relative powers of the antagonists. The right to counsel extends to cases in which "a fundamental liberty interest . . . is at risk." Grove, 127 Wash.2d at 237, 897 P.2d 1252.
¶ 35 As we concluded earlier, the petitioner's fundamental liberty interest is not at stake here. An order terminating parental rights ends the parent/child relationship entirely and permanently. "[A]ll rights, powers, privileges, immunities, duties, and obligations, including any rights to custody, control, visitation, or support" are severed and terminated and the parent thereafter has no standing in legal proceedings concerning *668 the child. RCW 13.34.200. A termination order leaves the parent without the right to talk or meet the child, or to participate in or be informed about the child's development. The parent is allowed no opportunity to make decisions regarding the child's upbringing.
¶ 36 In contrast, a decree of dissolution between parents does not sever either parent's rights and responsibilities over the children. The rights and responsibilities of the parents are not terminated but rather allocated. Furthermore, the parents retain the right to seek modification of the parenting plan. RCW 26.09.260. They also retain standing in legal proceedings concerning the children. The interest at stake here is not commensurate with the fundamental parental liberty interest at stake in a termination or dependency proceeding.
¶ 37 In addition, the State plays a meaningfully different role; the state neither applies its resources against either party nor instigates the proceeding. In fact, state resources reduce the risk of erroneous results.[16]
¶ 38 These factors distinguish a dissolution proceeding from instances where counsel is constitutionally required. We conclude that Ms. King is not entitled to appointed counsel under article I, section 3.
¶ 39 Finally, we do not agree with Ms. King's argument that the trial court should have appointed counsel under the Fourteenth Amendment's guaranty of due process. Br. of Appellant at 33.[17] There is a presumption that civil litigants do not have a right to appointed counsel unless their physical liberty is at risk. Lassiter, 452 U.S. at 27, 101 S.Ct. 2153 (finding no right to counsel in the termination proceeding). This presumption can be overcome when the Mathews balancing factors weigh heavily enough against that presumption. Those factors are "[f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." Mathews, 424 U.S. at 335, 96 S.Ct. 893.
¶ 40 A right to appointed counsel at public expense does not attach under the Fourteenth Amendment in these circumstances. The petitioner has cited no federal case that supports her position. Here, the petitioner's interest is not as great as would be in a proceeding where the State sought to terminate her parental rights. The State's interest in the financial burden resulting from appointment of counsel at public expense is substantial. As we noted above, statutory safeguards provided by the legislature to protect the children's interests also reduce the risk of erroneous results. As the standard is set out in Lassiter, we cannot conclude that the Mathews factors overcome the presumption against a right to appointment of counsel in cases like this one.
Article I, section 12
¶ 41 Finally, Ms. King argues that the trial court should have appointed counsel under article I, section 12[18] or federal equal protection analysis. Ms. King argues that use of the courts to resolve disputes is a privilege that is not available equally "when, in a complex adversarial proceeding involving a critical interest" an indigent person has *669 tried unsuccessfully to obtain counsel and none was appointed. Br. of Appellant at 42. The respondent did not address her argument. Amicus Washington State Attorney General Robert M. McKenna argues that the petitioner's argument fails under both constitutions. The Washington State attorney general argues that because "[t]he fact that in a dissolution action, one spouse may have counsel while the other does not in no way translates into a governmental grant of a special privilege to a represented spouse." Amicus Br. of Wash. State Att'y Gen. at 19.
¶ 42 For a violation of article I, section 12 to occur, the law, or its application, must confer a privilege to a class of citizens. Grant Cy. Fire Prot. Dist. No. 5 v. City of Moses Lake, 150 Wash.2d 791, 812, 83 P.3d 419 (2004). Our privileges and immunities provision protects, in part, "against laws serving the interest of special classes of citizens to the detriment of the interests of all citizens." Grant Cy. Fire Prot. Dist. No. 5, 150 Wash.2d at 806-07, 83 P.3d 419. The terms "privileges and immunities" refers solely to those fundamental rights that belong to citizens of Washington by reason of their citizenship. Grant Cy. Fire Prot. Dist. No. 5, 150 Wash.2d at 813, 83 P.3d 419.
¶ 43 In this case, the dissolution statutes do not create a privilege. The petitioner is not denied, as a result of the statute's application, a privilege to which she would have been entitled but for government interference. Nothing affirmatively done by the State in this matter facilitated the respondent's litigation or hindered the petitioner's ability to litigate. For example, the State did not require the appearance of counsel in order for the respondent to participate. This is a purely private matter initiated by the parties. We find no violation of article I, section 12.
¶ 44 We would likewise find no violation were we to review her claim under federal equal protection analysis. Under the federal equal protection clause, no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The states must treat like cases alike. Vacco v. Quill, 521 U.S. 793, 799, 117 S.Ct. 2293, 138 L.Ed.2d 834 (1997).
¶ 45 The petitioner cites no case supporting her claim that the State has here drawn any distinction or classification to which she is subject. We likewise cannot find a basis to conclude that the State is responsible for any classification. We find no basis for her claim that the failure to appoint counsel violated her constitutional rights under federal equal protection analysis.

CONCLUSION
¶ 46 It may be that the legislature should expend resources to address the complexity that often accompanies dissolution proceedings. "A wise public policy . . . may require that higher standards be adopted than those minimally tolerable under the Constitution." Lassiter, 452 U.S. at 33, 101 S.Ct. 2153. However, the decision to publicly fund actions other than those that are constitutionally mandated falls to the legislature. Outside of that scenario, it is not for the judiciary to weigh competing claims to public resources.
¶ 47 We affirm the decision of the superior court.
WE CONCUR: GERRY L. ALEXANDER, C.J., SUSAN OWENS, MARY E. FAIRHURST, JAMES M. JOHNSON, JJ., and C.C. BRIDGEWATER, J. Pro Tem.
SANDERS, J. (concurring).
¶ 48 The majority concludes there is no constitutional right to counsel paid at public expense in a dissolution proceeding. I concur in the result but write separately to emphasize the general rule that requires a determination of state action prior to the analysis of the merits of a claim alleging deprivation of a constitutional right. Since I do not believe there is state action here, I would deny Brenda King's claim on this ground alone.
¶ 49 Ms. King seeks declaratory and injunctive relief from continued enforcement of a parenting plan established between her and her ex-spouse. Ms. King argues state action exists because (1) any adjudication and enforcement *670 of private rights by the judiciary is sufficient state action and (2) dissolution and child custody determinations involve state action because state law mandates the court as the exclusive forum. Br. of Appellant at 17. The majority assumes the validity of Ms. King's argument. Majority at ___ n. 5, 174 P.3d at 664 n. 5.
¶ 50 Her first argument fails because its scope is too broad, emasculating the public/private dichotomy essential to maintaining personal liberty and protecting the State from responsibility for conduct not reasonably attributable to it. Her second argument fails because the State's enactment of neutral regulations alone is insufficient state action; a dissolution and child custody proceeding is merely public recognition of private facts with the court merely the neutral governmental entity recognizing the private matter. Because the State cannot be held responsible for the King dissolution or Ms. King's financial inability to retain counsel, there is no state action.
¶ 51 With limited exception "the fundamental nature of a constitution is to govern the relationship between the people and their government, not to control the rights of the people vis-á-vis each other." Southcenter Joint Venture v. Nat'l Democratic Policy Comm., 113 Wash.2d 413, 422, 780 P.2d 1282 (1989); see also James M. Dolliver, The Washington Constitution and "State Action": The View of the Framers, 22 Willamette L.Rev. 445, 448 (1986). This public/private distinction has long been a feature of this country's jurisprudence. See Civil Rights Cases, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883). It has been called the "essential dichotomy," preserving individual liberties by limiting the reach of constitutional restrictions to only those of state actors. Jackson v. Metro. Edison Co., 419 U.S. 345, 349, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). Without this separation, private individuals would "face constitutional litigation whenever they seek to rely on some state rule governing their interactions with the community surrounding them." Lugar v. Edmondson Oil Co., 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982).
¶ 52 This dichotomy is also necessary to "avoid[] imposing on the State, its agencies or officials, responsibility for conduct for which they cannot fairly be blamed." Id. at 936, 102 S.Ct. 2744. As one scholar recently described the state action doctrine: "[it is] about responsibility, not causation. . . . [The] generic patterns in the case law concerning state action: State Officer or Agent; Joint Venturer; Encouragement; Affirmative Approval; and Traditional State Function  describe ways of being responsible for illicit outcomes, not ways of causing them." Don Herzog, The Kerr Principle, State Action, and Legal Rights, 105 Mich. L.Rev. 1, 24-25 (2006) (internal citations and quotation marks omitted).
¶ 53 Whether state action exists is sometimes not readily determinable. Reitman v. Mulkey, 387 U.S. 369, 378, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967) (stating there is no "infallible test" for determining the existence of state action). Whether an alleged deprivation of a protected right is "fairly attributable" to the state involves a two part test:
First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible. . . . Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor.
Lugar, 457 U.S. at 937, 102 S.Ct. 2744 (citations omitted). As the Court in Lugar pointed out, these two distinct inquiries are related, "collaps[ing] into each other when the claim of a constitutional deprivation is directed against a party whose official character is such as to lend the weight of the State to his decisions[,] . . . [but] diverg[ing] when the constitutional claim is directed against a party without such apparent authority, i.e., against a private party." Id. (citation omitted). Here, Ms. King is seeking relief not from some specific state actor or action but from continued enforcement of a parenting plan established on grounds supplied by her and her ex-spouse. The question becomes whether the State's authorization of Michael King's conduct in terms of adopting and enforcing *671 this parenting plan constitutes state action.
¶ 54 Adjudication and enforcement of private rights is not sufficient state action in the sense necessary to implicate constitutional protections. It is axiomatic a state acts only through its executive, legislative, or judicial branch, Shelley v. Kraemer, 334 U.S. 1, 14, 68 S.Ct. 836, 92 L.Ed. 1161 (1948). State action, however, in the "full and complete sense of the phrase," id. at 19, 68 S.Ct. 836, exists only when the state is fairly responsible for the conduct in question. See Lugar, 457 U.S. at 937, 102 S.Ct. 2744. Merely providing a neutral forum to resolve a private dispute is insufficient state action without something more to make the state responsible for the alleged deprivation of rights. The distinction between the state acting itself and the state obligated to act on grounds supplied by an individual is critical to maintaining the private/public dichotomy. Herzog, supra, at 7. Otherwise, any state enforcement of private rights would trigger constitutional litigation. Lugar, 457 U.S. at 937, 102 S.Ct. 2744.
¶ 55 Ms. King's reliance on Shelley, 334 U.S. 1, 68 S.Ct. 836, to support her argument that state action exists whenever private parties use courts to pursue private remedies is misplaced. While the United States Supreme Court in Shelley held judicial enforcement of racially restrictive covenants by state courts violates the equal protection clause of the Fourteenth Amendment, the United States Supreme Court has since pulled back the reach of Shelley, if not overruling it sub silentio, by requiring "something more" than the reliance on a statute or judicial proceeding. See Lugar, 457 U.S. at 939 n. 21, 102 S.Ct. 2744 (stating "we do not hold today that a `private party's mere invocation of state legal procedures constitutes "joint participation" or "conspiracy" with state officials satisfying the [state action requirement].'" (quoting id. at 951, 102 S.Ct. 2744 (Powell, J., dissenting))).
¶ 56 Additionally, the state's regulation of dissolution and child custody determinations does not place the state's imprimatur onto every action occurring within the required forum because a comprehensive regulatory scheme is insufficient to create state action without something more to implicate the state as the responsible party. See Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972); Jackson, 419 U.S. 345, 95 S.Ct. 449.
¶ 57 In Moose Lodge the Supreme Court held Pennsylvania's liquor licensing scheme was insufficient to make the state responsible for a private club's act of choosing its members on a discriminatory basis. As the Court explained:
The Court has never held . . . that discrimination by an otherwise private entity would be violative of the Equal Protection Clause if the private entity receives any sort of benefit or service at all from the State, or if it is subject to state regulation in any degree whatever. Since state-furnished services include such necessities of life as electricity, water, and police and fire protection, such a holding would utterly emasculate the distinction between private as distinguished from state conduct. . . .
Moose Lodge, 407 U.S. at 173, 92 S.Ct. 1965.
¶ 58 In Jackson, 419 U.S. at 354, 95 S.Ct. 449, petitioner argued the termination of her electric service without notice or hearing was state action because the state "`specifically authorized and approved'" the termination practice. The Court, holding that no state action existed, noted, "[i]f the mere existence of [a] regulatory scheme made the [Respondent's] action that of the State, then presumably the actions of a lone Philadelphia cab driver could also be fairly treated as those of the State." Id. at 350 n. 7, 95 S.Ct. 449.
¶ 59 Similarly here, the State's recognition, licensing, and regulation of marriage and dissolution, including child custody, is insufficient standing alone to create state action without eroding the necessary public/private dichotomy. If the recognition and regulation of marriage and dissolution were sufficient state action, then presumably the clergyman (or whomever else) conducting the marriage, the wedding planner, and the marriage counselor would be state actors subject to constitutional limitations.
¶ 60 Ms. King's reliance on Boddie v. Connecticut, 401 U.S. 371, 91 S.Ct. 780, 28 *672 L.Ed.2d 113 (1971), to support her argument that state action exists because state law requires judicial dissolution and child custody proceeding is also misplaced. In Boddie, the court held access to the courts for dissolution proceedings could not be limited on the ability to pay court fees and costs. Id. at 374, 91 S.Ct. 780. The Court specifically focused only on "access to the courts as an element of due process," id. at 375, 91 S.Ct. 780, not the broader implication that every dissolution proceeding necessarily involves state action. Furthermore, the state court in Boddie refused to waive its own fee requirement, an express state action effectively barring access to a judicial remedy. Boddie, 401 U.S. at 373-74, 91 S.Ct. 780.
¶ 61 Here, Ms. King was unable to afford counsel to assist her in her dissolution. The court denied her motion to have counsel appointed at public expense, but she was still able to obtain a dissolution and a child custody decree, just not one on terms she would prefer. As the Supreme Court stated, "[i]f the mere denial of judicial relief is considered sufficient encouragement to make the State responsible for . . . private acts, all private deprivations of property would be converted into public acts whenever the State, for whatever reason, denies relief sought." Flagg Bros., Inc. v. Brooks, 436 U.S. 149, 165, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978). This negates the "`essential dichotomy'" of our constitutional system. Id. (quoting Jackson, 419 U.S. at 349, 95 S.Ct. 449). For this reason I can find no state action and would deny Ms. King's claim on this ground alone.
WE CONCUR: JAMES M. JOHNSON, Justice.
MADSEN, J. (dissenting).
¶ 62 Civil marriage is an institution that is created, maintained, and controlled by the State to serve state interests. The State controls access to the institution, and dissolution of it. In order for divorcing parties to resolve disputes over their child's care and placement in a dissolution action, Washington State law requires that parents comply with complicated legal procedures in a Washington State court of law and subjects them to a complex set of state statutes governing their dissolution action.
¶ 63 The fundamental interest at stake in this dissolution proceeding has long been recognized, that is, a parent's fundamental interest in the day-to-day companionship, care, and charge of his or her children. As this court has observed, a parent's right to custody and control of his or her children is "`more precious to many people than the right of life itself.'" In re Welfare of Luscier, 84 Wash.2d 135, 137, 524 P.2d 906 (1974) (quoting In re Welfare of Gibson, 4 Wash. App. 372, 379, 483 P.2d 131 (1971)).
¶ 64 Ms. King's struggle to represent herself in this case demonstrates the legal hurdles that arise every day in courtrooms across Washington, showing the importance of counsel to a parent in a dissolution proceeding seeking to secure her fundamental right to parent her children. The majority's decision does not begin to address the obstacles an indigent parent encounters when she is unrepresented by counsel, nor does it realistically assess the loss she faces.
¶ 65 In addition, contrary to the majority opinion, this court has already established an independent state constitutional analysis that applies when child custody issues are involved. Article I, section 3 of the Washington State Constitution provides that "[n]o person shall be deprived of life, liberty, or property, without due process of law." A parent's interest in the care, custody, and nurture of her child is a fundamental liberty interest protected under article I, section 3. Luscier, 84 Wash.2d at 139, 524 P.2d 906. Accordingly, under article I, section 3 of the Washington Constitution, Ms. King's interest at stake requires that counsel be appointed at public expense. Because the majority concludes otherwise, I dissent.

FACTS
¶ 66 It is fortunate that attorneys have undertaken to represent Ms. King pro bono on this appeal. They have done a good job of advancing her arguments in favor of a constitutional right to appointed counsel. The issue is one of law. See Luscier, 84 Wash.2d 135, 524 P.2d 906 (addressing the issue *673 "`whether the right of a parent to his children is sufficiently fundamental to entitle an indigent parent to appointment of counsel at public expense in a permanent child deprivation proceeding as a matter of constitutional law'"). Nevertheless, as Ms. King's attorneys obviously recognize, the constitutional question can only be fully appreciated in light of the facts, because the facts reveal the disadvantages to which our system exposes the unrepresented parent, who, as this court has recognized in the context of dependency proceedings,
often lacks formal education, and with difficulty must present his or her version of disputed facts; match wits with . . . counselors, psychologists, and physicians and often an adverse attorney; cross-examine witnesses (often expert) under rules of evidence and procedure of which he or she usually knows nothing; deal with documentary evidence he or she may not understand, and all to be done in the strange and awesome setting of the . . . court.
In re Welfare of Myricks, 85 Wash.2d 252, 254, 533 P.2d 841 (1975).
¶ 67 Ms. King's case is complex, though not remarkably so. It is in a great many respects a microcosm of the legal hurdles that arise in quite ordinary circumstances, and therefore is a representative case for showing the importance of counsel to a parent seeking residential placement of her children. Because the facts illuminate the need for counsel and show how the absence of representation can frustrate proceedings in a court of law, I present them in some detail.
¶ 68 Brenda King and her former husband Michael were married in 1994. They have three children, and Ms. King also has two older children. Ms. King, who left school after the ninth grade, did not work outside the home. Instead, she was the primary caregiver for the five children and handled all the day-to-day parenting tasks.
¶ 69 The Kings initially separated in October 2003 and then permanently separated in 2004. In September 2004, Michael King petitioned for dissolution of the marriage. Ultimately, he sought to become the primary residential parent for the Kings' three children. Until a few months before trial, the children remained with Ms. King, but then were placed with Michael King under a temporary order.
¶ 70 Michael King has been represented by counsel throughout these proceedings. Brenda King first sought help from the Northwest Justice Project, a statewide provider of civil legal aid, but this organization was unable to take her case at the time and referred her to Snohomish County Legal Services, a volunteer (pro bono) lawyer program. She visited their advice clinic in December 2004. In January 2005, Ms. King used her rent money to hire a private attorney who appeared on her behalf in connection with motions for temporary orders, commencement of discovery, agreement to handle Michael King's discovery requests, and requesting appointment of a guardian ad litem. When Ms. King was unable to make additional payments counsel withdrew, and as of mid-April 2005 Ms. King was again unrepresented.
¶ 71 Trial was continued from April 7, 2005 to August 17, 2005. In May, Ms. King made several calls and visits to Snohomish County Legal Services, which tried unsuccessfully over several months to find a lawyer who would provide pro bono services.
¶ 72 On August 17, 2005, at Ms. King's request trial was again continued, this time for five months. In her motion, she asked for the continuance to allow time for discovery.[1] On September 13, 2005, she attended a Legal Services clinic and met with an attorney who noted that she was in "dire need of a pro bono attorney." Clerk's Papers (CP) at 57. Legal Services again unsuccessfully attempted to locate counsel. Although several attorneys viewed the file, they declined to take the case, citing complexities in parenting plan issues, the amount of discovery required, the time involved, and lack of preparation time.
¶ 73 One month before the scheduled trial date, Ms. King declined an offer by Legal Services to assist her with a motion for another *674 continuance of trial. Ms. King told Legal Services that a request for a continuance would be futile given how close the trial date was and the lack of any success in securing pro bono representation. Nonetheless, she then filed a pro se motion for another continuance, raising issues she had raised earlier. Her motion was denied.
¶ 74 The trial court was clearly aware of her lack of representation. On several occasions Ms. King informed the court she needed counsel and that she could not obtain a lawyer because she could not afford one. For example, on May 18, 2005, she wrote, "I AM PRO SE Because I am broke." CP at 51.
¶ 75 The trial conducted in January 2006 lasted five days. Although there was only one contested issue, the primary residential placement of the three children, the trial involved psychological matters and allegations of domestic violence. Ms. King appeared pro se, acting as party, witness, and lawyer, under circumstances where the stakes for her were huge and her emotional involvement commensurate with the stakes.
¶ 76 Among other difficulties, she faced a guardian ad litem who was adverse to her position. The guardian ad litem recommended that the children reside primarily with their father and that he have sole decision-making authority on all major issues. The guardian ad litem also testified that the children missed school days when living with Ms. King, were often tardy, that Ms. King disrupted the school, and that the staff was very concerned. But the guardian ad litem testified without having contacted individuals that Ms. King had recommended as having knowledge about the children while having contacted many people recommended by Michael King. The guardian ad litem never prepared a final report, and the last "interim" report was prepared before Michael King underwent anger management evaluation. Ms. King needed the skills and knowledge of a lawyer to know when to object to the guardian ad litem's testimony and how to impeach her testimony. She was unable to do either effectively.
¶ 77 The guardian ad litem also testified that school officials had testified that the children came to school hungry while in Ms. King's care. Ms. King did not object to this hearsay testimony and the trial court gave it great weight in its decision. Testimony from school officials would have contradicted this hearsay. But Ms. King failed to subpoena and offer such contradictory testimony at trial. Instead, after the trial court made its decision placing the children with Michael King, a school official delivered a letter to the court refuting evidence that anyone at the school had ever said the children came to school unfed. In the end, the trial court noted that it had "only sketchy information" about the children's school life, although such information was critical for a decision.
¶ 78 The trial judge commented several times about Ms. King's situation, saying that the court "tried to be patient and extend some courtesies to the mother because she [was] without counsel." CP at 84. The court tried to accommodate her lack of legal ability by giving explanations about legal processes such as how to admit exhibits, the hearsay rule, exceptions to the rule, questioning hostile witnesses, the scope of cross-examination, and what kind of evidence a court can properly consider. But not surprisingly, Ms. King simply could not conduct herself as a lawyer.
¶ 79 She could not understand and implement differences between offering testimony, questioning witnesses, and making argument to the court. Particularly damaging to her case was her lack of knowledge that pretrial reports, motions, and other submissions, aside from the guardian ad litem's report, would not be considered as evidence. Because she did not know this, she failed to subpoena witnesses. Thus, the trial court did not hear from some witnesses who had provided declarations favorable to Ms. King earlier in the case. She did not know how to get some exhibits admitted or introduce evidence from them through other means. She also did not know how to obtain documents through discovery that a lawyer could have obtained, such as Michael King's financial records.
¶ 80 The guardian ad litem and the trial court relied on an anger management report *675 about Michael that was admitted into evidence (the professional who prepared it did not testify). However, the report states it is "to be considered null and void if the client failed to provide or intentionally withheld any pertinent developmental or legal history." Pet'r's Ex. 6, at 6. Michael King had not disclosed a resisting arrest conviction or charges for violating a protection order, ongoing trouble with finances and employment, or that he had been required by an employer to take an anger management course because of threats he had made.
¶ 81 Ms. King was ill-equipped to handle issues that arose that would ordinarily require expert testimony, such as the question whether she suffers from attention deficit disorder and, if so, whether this affected her parenting ability. Due to her lack of skills as a lawyer, she did not present other testimony, for example, that of a therapist who would have testified, contrary to other witnesses, that the children were clean.
¶ 82 Ms. King was also unable to effectively counter the skilled lawyering of Michael King's counsel. She failed to object to hearsay evidence counsel introduced or to make other objections on the ground of leading witnesses, speculative testimony, or lack of foundation. Her present pro bono counsel cite to numerous places in the record where they believe successful objections to admissibility of damaging evidence could have been made.
¶ 83 The trial court's patience and attempts to accommodate Ms. King's lack of knowledge and skills were sorely tried. The court said, for example, "[p]lease ask questions and avoid the commentary or I won't permit you to ask questions," 2 Verbatim Report of Proceedings (VRP) at 111, and "Ms. King, I'm a fairly patient person, and you're taxing my patience greatly," 3 VRP at 108. On its own, the court frequently refused to allow Ms. King's questions, testimony, and exhibits. The court also asked Michael King's attorney to object more, saying, "And if counsel will object when [Brenda King's] questions are so grossly inappropriate, I'd appreciate it." 3 VRP at 92.
¶ 84 In part due to Ms. King's lack of familiarity with legal procedures, the trial took a great deal of time. The court was also concerned about this and advised Ms. King that it would limit her time, and on several occasions did so.
¶ 85 Ms. King's self-representation not only fell far short of that which counsel could have provided, it affirmatively did her own case harm. This should surprise no one; the stakes were huge. She was facing the loss of her children. She could not separate her emotions from her conduct as her own legal representative. The judge commented at one point that her manner of cross-examining made him "feel [like] I'm in the middle of a marital argument between you and your husband that is initiated solely by you." 3 VRP at 108. Indeed, the judge stated that Ms. King's cross-examination of the guardian ad litem showed why she was not a capable parent, stating that she had "not accepted the message, and instead . . . tried to shoot the messenger." CP at 102.
¶ 86 Following trial and issuance of the court's order placing the children with Michael King, a private attorney acting pro bono appeared on Ms. King's behalf and moved for a new trial and appointment of counsel. The trial judge stated:
[A]lthough respondent was at a significant disadvantage through her inability to retain counsel to represent her at trial and her inability to secure pro bono representation, despite her requests for such representation, which circumstances mirror the access to justice crisis throughout the State, regrettably there are no public resources available with which to compensate counsel if an attorney were to be appointed to represent respondent and the court is unwilling to go beyond the present ethical encouragement that attorneys accept pro bono service and designate a family law practitioner to represent Ms. King without compensation.
CP at 39-40.
¶ 87 The trial judge also said:
[C]andidly I agree with you insofar as your arguments about Mrs. King not being well served because she was pro se. I think the record will bear that out. That she had a very difficult time at trial that there *676 were objections that she was unfamiliar with, did not respond. Evidence that she apparently had consisting, I think, in some cases, of police reports that didn't see the light of day because there were proper objections based on hearsay. And she didn't know enough about the rules to secure the presence of a witness to testify to what facts she thought might have been relevant. And I think in the materials that you submitted, you've also pointed out from the daycare or the school, rather, some information that did come in to evidence because it appears there was no objection. And some of that information was hearsay and may have been inaccurate, which is why we have hearsay objections, which Mrs. King did not raise at trial or I would have sustained an objection and kept some of that evidence out.
So, in principle, I agree with you that she should have been represented by an attorney. I think when there are issues of parenting and, in this case, a change from primary residential parenting, at least in fact from the mother to the father, these are critical issues. They're no less serious to the litigants, it seems to me, than the potential loss of liberty that comes from criminal proceedings.
VRP at 2-3 (Resp't's Mot. for Recons. & New Trial, Feb. 27, 2006).
¶ 88 As the facts show, Ms. King lacked even a high school education, much less the education and training necessary to be a lawyer. She was unable to present her case effectively because she could not master the rules of evidence and she was unable to prevent admission of evidence that a lawyer would have been able to keep out. Ms. King was unable to match the skill of opposing counsel. Her emotions adversely affected her performance, and the record makes it clear that by the end of trial she had exhausted the court's patience. The trial judge frankly acknowledged that Ms. King's self-representation had been inadequate.
¶ 89 The record shows that Ms. King worked very hard, and tried as best she knew how, to secure placement of her children with her. While it cannot be said that she would have prevailed with the assistance of counsel, she was clearly at a significant disadvantage without it.

ANALYSIS
¶ 90 The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Fundamental liberty interests include the right of parents to establish a home and bring up children, to control their education, to direct their upbringing, and to make decisions concerning their care, custody, and control. Troxel v. Granville, 530 U.S. 57, 65-66, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) (citing Meyer v. Nebraska, 262 U.S. 390, 399, 401, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); Pierce v. Society of Sisters, 268 U.S. 510, 534-35, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); Prince v. Massachusetts, 321 U.S. 158, 166, 64 S.Ct. 438, 88 L.Ed. 645 (1944); Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); Wisconsin v. Yoder, 406 U.S. 205, 232, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); Washington v. Glucksberg, 521 U.S. 702, 720, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997)).
¶ 91 Washington courts "have been no less zealous" than the United States Supreme Court in "their protection of familial relationships." Luscier, 84 Wash.2d at 137, 524 P.2d 906. Early in this state's history the court recognized parents' right to "the care, control, custody and education of their children." Lovell v. House of the Good Shepherd, 9 Wash. 419, 422, 37 P. 660 (1894). The parent has a "natural and sacred right . . . to the custody of his or her child." In re Welfare of Hudson, 13 Wash.2d 673, 678, 685, 126 P.2d 765 (1942); accord Luscier, 84 Wash.2d at 137, 524 P.2d 906. A parent's right to custody and control of her child is "`more precious to many people than the right of life itself.'" Luscier, 84 Wash.2d at 137, 524 P.2d 906 (quoting Gibson, 4 Wash.App. at 379, 483 P.2d 131).
¶ 92 Article I, section 3 of the Washington State Constitution provides that "[n]o person shall be deprived of life, liberty, or property, without due process of law." A parent's *677 interest in the care, custody, and nurture of her child is a fundamental liberty interest protected under article I, section 3. Luscier, 84 Wash.2d at 139, 524 P.2d 906.
¶ 93 The majority engages in a Gunwall[2] analysis and concludes that the state constitution's due process clause does not require an independent state constitutional analysis; instead, the analysis in Lassiter v. Department of Social Services, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981), which applies under the Fourteenth Amendment to termination of parental rights proceedings, also applies under article I, section 3. This conclusion is a departure from the court's reasoning in In re Dependency of Grove, 127 Wash.2d 221, 229 n. 6, 897 P.2d 1252 (1995). In Grove, which was decided after Lassiter, this court stated: "In civil cases, the constitutional right to legal representation is presumed to be limited to those cases in which the litigant's physical liberty is threatened, . . . or where a fundamental liberty interest, similar to the parent-child relationship, is at risk." Grove, 127 Wash.2d at 237, 897 P.2d 1252 (emphasis added) (footnote omitted) (citations omitted) (citing Luscier and Myricks).
¶ 94 In Luscier, the court observed that "the lack of counsel, in itself, may lead improperly and unnecessarily to deprivation of one's children." Luscier, 84 Wash.2d at 138, 524 P.2d 906. In Luscier, this court held that indigent parents are entitled under the Fourteenth Amendment and article I, section 3 to appointed counsel at public expense in proceedings where parental rights may be terminated. Subsequently, the court reached the same conclusion with regard to dependency proceedings. Myricks, 85 Wash.2d 252, 533 P.2d 841. There, the court again noted that the right of a parent to the companionship of his or her child is fundamental. Id. at 254, 533 P.2d 841. The court explained that the essence of due process is the right to be heard, and the hearing must be both meaningful and appropriate to the case. Id. The court emphasized that in a dependency action an indigent parent acting pro se is at a distinct disadvantage. Id. The court concluded that "the nature of the rights in question and the relative powers of the antagonists, necessitate the appointment of counsel." Id. at 255, 533 P.2d 841.
¶ 95 Neither Luscier nor Myricks established any presumption limiting the right to representation to physical liberty. Nor did either case engage in the balancing test propounded in Lassiter. Both cases were decided under article I, section 3. By expressly reaffirming the decisions in Luscier and Myricks, and counterposing those cases to Lassiter, this court in Grove plainly recognized that a different analysis applies under article I, section 3 than applies under the Fourteenth Amendment when the fundamental interest in one's children is at stake. No Washington case has ever held that Luscier or Myricks was wrongly decided or is no longer valid.
¶ 96 Grove is not the only case recognizing that article I, section 3 calls for an independent state constitutional analysis in certain contexts, either. Although this court has often treated the due process inquiry under the state and federal constitutions as the same, Grove and other precedent exists for the premise that in some contexts an independent analysis applies under article I, section 3. See State v. Bartholomew, 101 Wash.2d 631, 641, 683 P.2d 1079 (1984) (the reliability of evidence standard embodied in the state constitution's due process clause provides broader protection than federal due process).
¶ 97 Our precedent stands for the premise that when the fundamental liberty interest in one's children is at stake, an independent state constitutional analysis should be applied. The majority unfortunately departs from this premise. I would not.
¶ 98 The majority also reasons that unless termination of the parent-child relationship is at issue, either in an action for termination of parental rights or in a dependency proceeding that might eventually lead to termination of parental rights, a parent does not have a sufficient interest at stake to command appointment of counsel at public expense.
*678 ¶ 99 But as Ms. King's attorneys correctly point out, a parent's "liberty interest in [her child is in] the development of the parent-child relationship, not just its bare existence." Appellant's Answer to Br. of Amicus Curiae Robert M. McKenna, Att'y General at 12. The majority's reasoning ignores the very real effect of what happens when one parent is denied primary residential placement after she has been the primary caregiver of her child. Where before she was involved in the day-to-day interactions, nurturing, and decision-making that together comprise a great part of a parent's relationship with her child, once her child is placed elsewhere she loses the day-to-day relationship in which she directed the upbringing and education of the child, nurtured him through the innumerable ups and downs of a young person's life, and helped prepare the child for his own responsibilities and duties in life. She loses the day-to-day emotional contact and physical contact. She loses the hectic surroundings of the morning when she helps the child get ready for school and the good-night rituals that precede bedtime for her child. Her child will not be in her home so that she can soothe him when he is hurting from a skinned elbow or from the unkind words of another child. She will not be present in her children's daily lives to provide ongoing spiritual guidance, if she wishes, or to teach manners and civic responsibility when each new day brings the opportunities to do so. She and her child will not be together day by day to nourish and share their love for each other. When a child is removed from the parent's home, thousands of moments of interactions are lost.
¶ 100 Those thousands of moments, adding up to years of development, are no longer hers. The loss of the parent's presence in the child's life and her contribution to the child's development exists regardless of whether the parent-child relationship still legally exists.
¶ 101 The fact that residential placement is subject to modification does not make the loss any less. Generally, modification of a custody decree cannot occur unless a court finds that there has been a substantial change in the circumstances of the child or the nonmoving party and that "modification is in the best interest of the child and is necessary to serve the best interests of the child." RCW 26.09.260(1). The circumstances under which a parent can move for modification of a custody decree are not within the control of the parent and may never occur. A parent cannot simply move to modify the decree once she obtains funds, if she ever does, to hire counsel to help her try to convince the court that primary residential placement should be with her.
¶ 102 The majority also believes that unless a parent is faced with the State as the party opponent, appointed counsel is not required. This is a somewhat puzzling conclusion, because whether faced with the superior and unequal resources of the State or the superior and unequal resources of an opposing parent who is represented by counsel, the parent is at a distinct and unfair disadvantage in proceedings to determine the primary residential placement of the child. Moreover, trial courts can access their own experts to conduct evaluations and studies of the parties, appoint guardians ad litem for the children, participate in questioning at trial and so on. An indigent pro se litigant in a "private" custody dispute can face resources as formidable as occur in parental termination proceedings.
¶ 103 But a marital dissolution cannot be viewed as a private affair akin to a contract dispute or a tort claim. Civil marriage is an institution that is created, maintained, and controlled by the State to serve state interests. The State controls access to the institution, and dissolution of it. State statutes govern the determination of child placement at the termination of a marriage. Even if the divorcing parents agree as to every aspect of their dissolution, their stipulations must be approved and entered by a court to have effect, and a court must agree that a parenting plan jointly agreed to by the parents is in the best interests of the child. RCW 26.09.002, .181, .184, .187.
¶ 104 Finally, as Ms. King's attorneys point out, safeguards that the majority cites as ensuring protection from erroneous decisions were followed, at least in letter, in the *679 trial in this case. The trial judge nevertheless concluded, when ruling on the motion for a new trial and appointment of counsel, that Ms. King had been at a disadvantage because she lacked legal representation.
¶ 105 Under the independent state constitutional analysis applied in Luscier and Myricks, whether counsel must be appointed depends on the nature of the rights in question, and the relative powers of the antagonists. Luscier and Myricks involved the State as one of the parties, while here a parent is involved in a private dispute over custody.
¶ 106 Applying the analysis from Myricks: An indigent parent who lacks counsel is, as the trial court reasoned, at a distinct disadvantage. A contested custody dispute often involves complex issues, expert witnesses, cross-examination of witnesses under the rules of evidence, documentary evidence, and the testimony and recommendations of a guardian ad litem who may be adverse to the indigent parent's position. In addition, the parent may face not only counsel representing the other parent, but also counsel for the children, if one was appointed. The parent's right at issue is her fundamental liberty interest in the care, custody, companionship, and control of her children  perhaps the most precious right a person may hold. That an individual may be deprived of liberty is the key issue in deciding whether counsel is constitutionally required. Myricks, 85 Wash.2d at 255, 533 P.2d 841. Although the State is not the party opponent in this case, if Ms. King loses she is deprived of the care, custody, companionship, and control of the children whether the State takes custody through termination or dependency proceedings or her former husband does through private litigation.
¶ 107 Given the nature of the rights in question, with so great a loss at stake, the enormous complexity of the domestic relations laws, and the fact that the unrepresented parent, due to indigency, is totally unequipped to put forward the necessary evidence, the circumstances here are sufficiently similar to those in Luscier and Myricks to require the same constitutionally-demanded right of counsel at public expense under article I, section 3. I would hold that she is entitled to appointed counsel at public expense under the due process clause of the state constitution.
¶ 108 It is important to bear in mind that beyond Ms. King's case, empirical studies have shown that indigent litigants without counsel receive less favorable outcomes than those with counsel. A Harvard law professor studied 900 families involved in custody proceedings. The study found that attorney-represented mothers were twice as likely as pro se mothers to be awarded full or joint custody when opposing fathers were represented by counsel. Robert H. Mnookin, Eleanor E. Maccoby, Catherine R. Albiston & Charlene E. Depner, Private Ordering Revisited: What Custodial Arrangements are Parents Negotiating?, in Divorce Reform at the Crossroads (Stephen D. Sugarman & Herma Hill Kay eds., 1990). A study in King County, Washington, found that shared parenting plans are as much as 42 percent more likely where both parties are represented by counsel than in cases where one party appears pro se. Jane W. Ellis, Plans, Protections, and Professional Intervention: Innovations in Divorce Custody Reform and the Role of Legal Professionals, 24 U. Mich. J.L. Reform 65, 132 (1990). Other studies show similar disparity between parties represented by counsel and parties acting pro se. E.g., Carroll Seron, Gregg Van Ryzin, Martin Frankel & Jean Kovath, The Impact of Legal Counsel on Outcomes for Poor Tenants in New York City's Housing Court: Results of a Randomized Experiment, 35 Law & Soc'y Rev. 419, 428-29 (2001).
¶ 109 Pro se litigants, who frequently fail to present critical facts, cite relevant authority, or make proper objections (and understandably fail to do so) can affect the decision-making process. Federal District Court Judge Robert W. Sweet observed that "every trial judge knows[] the task of determining the correct legal outcome is rendered almost impossible without effective counsel." Robert W. Sweet, Civil Gideon and Confidence in a Just Society, 17 Yale L. & Pol'y Rev. 503, 505 (1998).
¶ 110 These studies and comments highlight the serious consequences of litigating *680 child placement issues without legal representation. It is a fact of life that a pro se parent cannot navigate the legal channels in a custody dispute with the degree of success that a lawyer can. It is simply unfair to a parent to require her to face a represented opponent in a court of law when her relationship with her children is at stake.
¶ 111 Finally, I disagree with the concurrence that standing bars this claim. If Ms. King has a constitutional right to counsel at public expense, the only application such a right has is in legal proceedings. If she cannot complain in a court of law that she has a right to counsel but it was denied, then she cannot complain at all. I do not believe the standing doctrine was ever meant to preclude what is at the least a colorable claim to a constitutional right to counsel. Stated a bit differently, the issue here is not so much whether a recognized constitutional right has been violated, but rather whether the state constitution affords a right to counsel at all. That question is answered as a matter of law by examining the provisions of the constitution and applying our constitutional jurisprudence, it is not answered by examining the conduct of the state as an actor.
¶ 112 Moreover, if the right to counsel does attach, then the only instance in which a violation can occur is in legal proceedings. In Boddie v. Connecticut, 401 U.S. 371, 376, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971), plaintiffs were welfare recipients who claimed that because they could not afford court fees and costs imposed by the state they were denied access to the courts to obtain dissolution of their marriages. The United States Supreme Court explained, "[e]ven where all substantive requirements are concededly met, we know of no instance where two consenting adults may divorce and mutually liberate themselves from the constraints of legal obligations that go with marriage, and more fundamentally the prohibition against remarriage, without invoking the State's judicial machinery." Id. at 376, 91 S.Ct. 780. The Court said that "[r]esort to the judicial process by these plaintiffs is no more voluntary in a realistic sense than that of the defendant called upon to defend his interests in court. For both groups this process is . . . the only available one." Id. at 376-77, 91 S.Ct. 780. The Court held that due process prohibited a state from denying, solely because of inability to pay court fees and costs for service of process, access to its courts to persons who sought dissolution of their marriages.
¶ 113 Finally, following Boddie, the Court addressed a similar bar to an indigent's appeal, this time in circumstances closely akin to those in Ms. King's case. This time, the Court made it clear that requisite state action exists in cases where a court decree extinguishes certain fundamental rights. In M.L.B. v. S.L.J., 519 U.S. 102, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996), the state of Mississippi required an appellant to pay the costs of record preparation in advance and denied an indigent mother's application to appeal in forma pauperis. The mother sought to appeal from a decree terminating her parental rights, in an action brought by her former husband and his wife where the state was not a party to the termination proceedings.
¶ 114 The Court stated that it "has consistently set apart from the mine run of cases those involving state controls or intrusions on family relationships. In that domain, to guard against undue official intrusion, the Court has examined closely and contextually the importance of the governmental interest advanced in defense of the intrusion." Id. at 116, 117 S.Ct. 555. The Court explained that "[c]hoices about marriage, family life, and the upbringing of children are among associational rights this Court has ranked as `of basic importance in our society,' rights sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard, or disrespect." Id. (quoting Boddie, 401 U.S. at 376, 91 S.Ct. 780). The Court stated that the indigent mother's "case, involving the State's authority to sever permanently a parent-child bond, demands the close consideration the Court has long required when a family association so undeniably important is at stake." Id. at 116-17, 117 S.Ct. 555 (footnote omitted).
¶ 115 Of particular importance here and contrary to the concurrence's view that state action should bar this suit, the Court said that

*681 [a]lthough the termination proceeding in this case was initiated by private parties as a prelude to an adoption petition, rather than by a state agency, the challenged state action remains essentially the same: [the indigent mother] resists the imposition of an official decree extinguishing, as no power other than the State can, her parent-child relationships.
Id. at 116 n. 8, 117 S.Ct. 555.
¶ 116 Analogously, here, although this is a private dispute, the only way a custody decree can ensue is by invoking the "state's judicial machinery" in a court of law. This is the only process through which Ms. King can be deprived of her fundamental liberty interest in her child, and the only forum in which she can seek to resist an official decree placing primary residential care of her children in someone else. Whether in a proceeding to terminate parental rights brought by the State or in a private custody dispute where she may be deprived of her relationship with her child, "the challenged state action remains essentially the same." Therefore, the required state action exists in sufficient measure in this case, just as it existed in M.L.B.
¶ 117 If Ms. King has a right to counsel, it can be violated only by denial in a court of law. If she cannot assert a violation under these circumstances because she lacks standing, the standing doctrine rather than the constitution decides, in effect, whether she has a constitutional right. But more to the point, the standing doctrine would render any constitutional right to counsel utterly meaningless. I would not permit the standing doctrine to act as an obstacle to determining whether Ms. King has a right to counsel, nor to prevent her from asserting its violation.

CONCLUSION
¶ 118 The majority fails to appreciate the full extent of the liberty interest a parent has in the relationship with his or her child, and erroneously concludes that under the state constitution the right to counsel does not attach unless termination of the parent-child relationship is at stake and the State is a party to the action. I would hold that an independent constitutional analysis applies in this context under the state due process clause, article I, section 3. In accord with the principles enunciated in Luscier and Myricks, an indigent parent has a due process right to appointed counsel at public expense in residential placement proceedings involving child placement because a parent has a liberty interest in his or her children at stake, just as it is in termination proceedings.
WE CONCUR: TOM CHAMBERS, Justice.
NOTES
[1] King filed a declaration in support of her motion for new trial in which she described her inability to pay for an attorney. CP at 41-43. In addition, Snohomish County Legal Services determined that she qualified for referral to pro bono counsel. CP at 56-59. As to her indigency, the trial court entered no findings on the question. Mr. King contends there is insufficient evidence to prove his wife was indigent at the time of trial. For the purposes of our analysis, we assume she was indigent.
[2] Respondent status was granted to Snohomish County. Several amicus briefs were received. Retired Washington Judges in Support of Appellant, the National Coalition for a Civil Right to Counsel, the Washington State Bar Association, the International Law Scholars, and the Northwest Women's Law Center filed amicus briefs in support of the petitioner. The attorney general of the state of Washington and the Washington State Association of Counties filed amicus briefs in support of the respondent. The Washington State Legislature filed amicus briefs in support of the positions taken by the state of Washington and the attorney general of the state of Washington.
[3] While the federal due process underpinnings of these decisions may have been eroded by the United States Supreme Court in Lassiter v. Department of Social Services, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981), since our holdings have been legislatively codified under RCW 13.34.090, we need not address the continuing validity of our cases. We note that Luscier and Myricks were favorably cited more recently in our case, In re Dependency of Grove, 127 Wash.2d 221, 897 P.2d 1252 (1995).
[4] The parenting plan provides for the "resolution of future disputes between the parents, allocation of decision-making authority, and residential provisions for the child." RCW 26.09.184(2).
[5] For the sake of this opinion, we assume without deciding that the state action requirement is satisfied. In general, the provisions of the state constitution govern the relationship between the people and their government and do not control the rights of the people to one another. Southcenter Joint Venture v. Nat'l Democratic Party Comm., 113 Wash.2d 413, 422, 780 P.2d 1282 (1989). Ms. King argues that even though residential placement of children occurs as a result of dissolution proceedings between private parties, there is state action because of the State's role in the dissolution process. Br. of Appellant at 17 (citing Boddie v. Connecticut, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971); Sniadach v. Family Fin. Corp., 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969); Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967); Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948)). Mr. King did not dispute whether there was state action.
[6] Chapter 26.09 RCW provides the statutory framework applicable in dissolution proceedings.
[7] Article I, section 3 provides, "[n]o person shall be deprived of life, liberty, or property, without due process of law." Article I, section 10 provides, "[j]ustice in all cases shall be administered openly, and without unnecessary delay." Under article I, section 12, "[n]o law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens, or corporations."
[8] "Congress can abrogate a State's sovereign immunity when it does so pursuant to a valid exercise of its power under § 5 of the Fourteenth Amendment to enforce the substantive guarantees of that Amendment." Lane, 541 U.S. at 518, 124 S.Ct. 1978. The legislation must, however, exhibit congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end. Lane, 541 U.S. at 520, 124 S.Ct. 1978 (citing City of Boerne v. Flores, 521 U.S. 507, 520, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997)).
[9] The Court found that Congress enacted Title II against a backdrop of pervasive, unequal treatment in the administration of state services and programs. The unequal treatment resisted several legislative remedies. A majority of public services and programs in state-owned buildings were inaccessible to and unusable by persons with disabilities.
[10] The Court noted that "Title II does not require States to employ any and all means to make judicial services accessible to persons with disabilities." Lane, 541 U.S. at 531-32, 124 S.Ct. 1978.
[11] The test that Ms. King suggests we adopt underscores a distinction in the nature of the "fundamental" right she asserts. The rule set out by the United States Supreme Court when it recognized a right to counsel in criminal matters was that "any person haled into court, who is too poor to hire a lawyer, cannot be assured a fair trial unless counsel is provided for him." Gideon v. Wainwright, 372 U.S. 335, 344, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). In Gideon, the petitioner was charged with a felony. Gideon was found guilty and the Florida Supreme Court denied his habeas corpus petition. The United States Supreme Court found that the assistance of counsel is necessary to ensure fundamental human rights of life and liberty (and, as such, was made obligatory on the states by the Fourteenth Amendment). In contrast, Ms. King would have us find a right to appointed counsel may attach when "crucial interests are at stake."

In addition, Ms. King's approach would require a case-by-case hearing to determine whether the indigent parent requesting appointment of counsel has a right to counsel. Such an approach would be unwieldy, time-consuming, and costly. The proceeding might itself require appointment of counsel to present the parent's case. We decline to adopt a case-by-case analysis.
[12] When presented with arguments under both the state and federal constitutions, we review the state constitution arguments first. State v. Carter, 151 Wash.2d 118, 125, 85 P.3d 887 (2004).
[13] Outside of cases involving a risk to a fundamental liberty interest, there is a presumption of a right to counsel only where physical liberty is at stake. In re Dependency of Grove, 127 Wash.2d 221, 237, 897 P.2d 1252 (1995).
[14] Ms. King argues that, as to the second factor, we must consider differences both between the respective due process clauses and between other provisions in the two constitutions. Br. of Appellant at 36 (citing article I, sections 1, 10, 29, and 32).

Article I, section 1 states, "[a]ll political power is inherent in the people, and governments derive their just powers from the consent of the governed, and are established to protect and maintain individual rights." Article I, section 10 provides that "[j]ustice in all cases shall be administered openly, and without unnecessary delay." Article I, section 29 states, "[t]he provisions of this Constitution are mandatory, unless by express words they are declared to be otherwise." The final section cited by King, section 32, provides, "[a] frequent recurrence to fundamental principles is essential to the security of individual right and the perpetuity of free government."
We have said that article I, section 32 is, at a minimum, an interpretative mechanism. Seeley v. State, 132 Wash.2d 776, 811, 940 P.2d 604 (1997). Even if article I, section 32 is a point of reference, Ms. King identifies no natural right, in existence at the time of the constitution's adoption, to appointed counsel. See Seeley, 132 Wash.2d at 812, 940 P.2d 604. Its relevance to this particular context is therefore questionable. As to the other sections, Ms. King cites no authority for the argument that they are relevant here.
[15] As we indicated above, the right of access to the courts is fundamental. However, we concluded that that right is not implicated in this case.
[16] As noted above, some of these resources include the ability for the court to seek professional advice in fashioning the parenting plan. RCW 26.09.210. The court may also appoint a guardian ad litem (as was done in this case) and may order an investigation and report concerning parenting arrangements. RCW 26.09.220(1). Where a unified family court exists, court facilitators may provide assistance to the parents regarding matters before the court. RCW 26.12.802(3)(d).
[17] Mr. King and Snohomish County argue that the Mathews balancing test should be applied only where a parent-child relationship is at risk of being permanently severed.
[18] Under article I, section 12, "[n]o law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens, or corporations."
[1] According to Michael King, another reason for delay of trial until January 2006 was that neither party followed local court procedure for confirmation of trial.
[2] State v. Gunwall, 106 Wash.2d 54, 720 P.2d 808 (1986).