IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Parenting Plan for:<br><br>B.C.J. aka K.J.K,<br><br>A minor child. | No. 83135-6-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

DíAZ, J. — Jordan Kidd (the father) appeals the juvenile court's order modifying the parenting plan for the child he shares with Jocelyn Jones (the mother). The father challenges the court's decisions to (1) reduce his residential time with the child; (2) require supervised visitation until he takes certain actions to vacate a prior court order changing the child's legal name; and (3) require the child's legal name to be changed to a name not proposed by either parent. Because the father fails to demonstrate that the juvenile court committed legal error or otherwise abused its discretion, we affirm.

I.     FACTS

The parties are parents of a minor child. In April 2019, when the child was 2 years old, the juvenile court entered a parenting plan after a trial. The court made findings that both parents had kept the child from the other parent, without good reason, and that the father had engaged in abusive use of conflict. As examples of abusive use of conflict, the court cited the following: the father reported the

Citations and pin cites are based on the Westlaw online version of the cited material.

mother to Child Protective Services when the child was not in danger; made derogatory comments about the mother; initiated conflict that caused the child to have to change daycare providers; called the mother in the middle of the night to FaceTime[1] the child; took the child to the doctor without notice to the mother in violation of the court's interim order; and generally lacked accountability or insight into the conflict he created. Based on the abusive use of conflict, the court limited the father's participation in decision-making and gave sole decision-making authority to the mother.[2]

Nevertheless, the plan provided for the parents to have equal residential time, on a week-on/week-off basis, until the child reached school-age. The plan also "allowed" daily FaceTime calls during a two-hour window in the evening and provided that each parent should allow the child access to a telephone or other device for that purpose. The plan also stated that, after December 1, 2020, either party could file a petition to modify the residential schedule "without having to find adequate cause based on the change of the child status (in 2021 he should be eligible to begin kindergarten)." The purpose of such modification would determine the "appropriate" residential schedule when the child started school.

In December 2020, the father petitioned to modify the parenting plan. The father claimed that the parenting plan was "out of date" and should be modified because the child would start school in 2021. He also requested limitations on the

---

[1] "FaceTime" is Apple Inc.'s video communication software.
[2] The plan expressly prohibited the father from taking the child to the doctor for non-emergency medical care or changing the child's daycare provider without written permission from the mother.

mother's parenting based on "custodial interference" and abusive use of conflict. That request was largely related to allegations that the mother failed to facilitate FaceTime calls during her residential time. Specifically, he asked the court designate him as custodian and allocate decision-making authority to him.[3] Initially, he proposed continuing the 50/50 residential schedule set forth in the 2019 plan. The father later proposed that, upon entering kindergarten, the child should reside with the father from Monday to Friday, and reside with the mother on weekends.[4]

In response, the mother asked the court to deny the father's petition and maintain the provisions of 2019 plan. The mother denied "custodial interference," pointing out that the child was unavailable at times for calls, regardless of whether it was the mother's or father's residential time.

The mother also raised a separate issue about the child's name. She explained that the parties had agreed to change the child's last name to match his father's, but she had not received a new birth certificate or other verification of the change.

In July 2021, a superior court commissioner found adequate cause to proceed to a modification trial. The parties represented themselves and, at the pretrial conference, the trial court identified the following issues to be addressed

---

[3] The 2019 plan designated the mother as the child's custodian.
[4] Shortly before seeking modification, the father sought to hold the mother in contempt, for violating a provision of the child support order, for failing to facilitate FaceTime calls, and for attempting to enroll the child in a Seattle Public Schools program. The court ultimately found the mother in contempt, but only for failing to follow a provision in the child support order related to taxes, and imposed a monetary sanction.

at the modification trial: decision-making, designation of custodian, residential schedule, and the child's name change.

At the outset of trial in August 2021, the father asked the court to adopt his parenting plan, claiming the mother was "unfit," neglectful, engaged in abusive use of conflict, was unwilling to co-parent, and lacked overall "wherewithal." The mother requested that the court (1) maintain the residential and decision making provisions of the prior plan, (2) approve the child's enrollment for the 2021-2022 year at the school she had selected, and (3) vacate an order entered in 2020 by a King County District Court changing the child's legal name (2020 name change order), because it changed the child's full name, not only his last name. The court considered the testimony of both parents, the child's godmother, and 17 exhibits admitted by the parties. After the trial concluded, the court conducted a second hearing to clarify its ruling on the admission of an exhibit and to make additional inquiries of the parties about the circumstances of the name change.

Based on the evidence presented, the court entered an order modifying the parenting plan, findings in support of its order, and a new parenting plan. The court again made a finding as to the father that his abusive use of conflict could result in serious damage to the child's psychological development and made an additional finding that the father has an emotional or physical problem that impacts his ability to parent. See RCW 26.09.191(3)(b), (e). Based on these findings, the court

maintained the mother's sole decision-making authority and reduced the father's residential time with the child.[5]

Regarding the 2020 name change order, the court found stark disagreement about the parties' arrangement. According to the father, the mother agreed to change the child's full name and signed a notarized document consistent with that agreement. The mother testified, however, that she agreed only to change the child's last name, in recognition of the fact that the father had become actively involved in the child's life. The mother also testified that the notarized letter provided to the court was (a) not the same as the document she signed and (b) included a handwritten interlineation in handwriting that was not hers.[6] Partly due to the dispute about the content of the document signed by the mother, and also because the date of the mother's signature did not match the date of the notary's signature, the court found that the notarized letter was "insufficient proof to show agreement by the Mother to change the child's full legal name." The court also found that the evidence tended to show that the mother was dismayed upon learning that the father had legally changed the child's full name, and her reaction appeared to be genuine. The court noted that the father had not provided the mother with the 2020 name change order, the child's new birth certificate, or the

---

[5] The new parenting plan provides for the father to have residential time with the child every other week, either from Friday to Monday, or from Wednesday to Monday, depending on the distance between the father's home and the child's school.

[6] The court indicated that the handwritten statement on the letter confirmed the mother's agreement to change both the first and last names of the child. But no exhibits, including Exhibit 18 which included the notarized letter, were designated for the record on review.

child's new social security card. The court determined that the 2020 name change order was possibly fraudulently obtained and the father's conduct in obtaining the order was "worrisome."

The trial court included provisions in the parenting plan to address the name change that required the father to (1) provide to the mother all identity documents obtained for the child after the name was changed, (2) obtain an order vacating the 2020 name change order, and (3) obtain a new name change order, adding the father's last name to the child's legal birth name. The court ordered the mother to cooperate with the father in these measures. The court found that the father's abusive use of conflict and emotional impairment, in conjunction with his conduct in obtaining the 2020 name change order and his sole possession of new identity documents, created an "actual risk" of abduction. In view of that risk, the court ordered the father's residential time to be supervised until he completed all three tasks set forth in the parenting plan.[7] The father sought reconsideration and the court denied his motion.

The father appeals. The mother has not filed a brief in response to the father's appeal.

## II. ANALYSIS

### A. Legal Principles

This court reviews trial court decisions involving the welfare of children, including a ruling on modification of a parenting plan, for an abuse of discretion. In

---

[7] The plan allows the supervisor to be a professional or, if agreed to by the mother, a non-professional.

re Marriage of Horner, 151 Wn.2d 884, 893, 93 P.3d 124 (2004); In re Marriage of Zigler and Sidwell, 154 Wn. App. 803, 808, 226 P.3d 202 (2010).  A court's decision is manifestly unreasonable if its factual findings are unsupported by the record, the court bases the decision on an incorrect standard, or the facts do not meet the requirements of the correct standard.  In re Marriage of Littlefield, 133 Wn.2d 39, 47, 940 P.2d 1362 (1997) superseded by statute on other grounds.

RCW 26.09.260 governs modification of a parenting plan.  A juvenile court may modify a parenting plan based on RCW 26.09.191 if it finds that a parent's involvement has an adverse effect on a child's best interests.  RCW 26.09.260(4) (court may "reduce or restrict contact between the child and the parent with whom the child does not reside a majority of the time if it finds that the reduction or restriction would serve and protect the best interests of the child using the criteria in RCW 26.09.191").  And, relevant here, the court has discretion to "preclude or limit any provisions of the parenting plan" based on (1) an emotional impairment that interferes with parenting functions, or (2) abusive use of conflict by the parent that creates the danger of serious damage to the child's psychological development.  RCW 26.09.191(3)(b), (e).  We review restrictions imposed under RCW 26.09.191 to determine whether substantial evidence supports the factual findings that set forth the basis for the restrictions.  See Greene v. Greene, 97 Wn. App. 708, 714, 986 P.2d 144 (1999) (when trial court has acted as factfinder, role of appellate court is to determine whether the findings are supported by the record and, in turn, if those findings support the conclusions).

B.  Reduction of Father's Residential Time

7

While acknowledging that findings under RCW 26.09.191 may support modifying a parenting plan, the father contends the evidence does not support the court's decision to reduce his residential time. He claims this is so because (1) neither party argued that the father's equal residential time was harmful to the child or suggested reducing it; (2) there was "overwhelming" evidence of a strong bond between father and child; and (3) the court's decision was based, "in large part" on a 2018 report of a Court Appointed Special Advocate (CASA) and other "outdated" information before the court at the previous 2019 trial.[8]

While it is true that only the father suggested changing the 50/50 residential schedule, no authority supports the father's apparent position that the juvenile court's authority and discretion under RCW 26.09.260 and RCW 26.09.191 is constrained by the parties' requests. And although the mother did not ask the court to adjust the residential schedule, the court found that she expressed concerns that the child was beginning to suffer emotionally and mentally due to the lack of collaboration and cohesion between the two households and the parties' "hostility" toward one another. The father does not challenge these findings, or any other factual findings made by the court. Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 808, 828 P.2d 549 (1992) (unchallenged findings of facts are verities on appeal).

---

[8] Insofar as the father suggests that the juvenile court was required to appoint a CASA or otherwise arrange for an independent assessment of the child's best interest, he did not make this request below. And while the court in 2019 "anticipated" an independent evaluation in the event of the parties' failure to agree to a residential schedule when the child entered school, neither the parenting plan nor the statute required the court to obtain an evaluation.

The father also misconstrues the basis for the trial court's determination that restrictions in the parenting plan were appropriate. There was evidence that the father and child share a significant bond and nothing in the order on modification or the 2021 parenting plan suggests otherwise. The restrictions imposed on the father were not based on an assessment of the quality or strength of the parent-child bond. Instead, they were expressly tied to the court's findings that the father engaged in conduct that warranted restrictions under .191. See RCW 26.09.191(3)(b), (e).

Whereas the court in 2019 made a finding of abusive use of conflict but concluded that limiting the father's decision-making would be sufficient to address the issue, the court reached a different conclusion following the 2021 modification trial. "The Court is now finding to protect the child, it is necessary to reduce Father's parenting time so he no longer has equal parenting time." After reciting the prior court's finding, the court determined that the father's abusive use of conflict "has continued" after entry of the 2019 plan and that his "decision to prioritize his grudge against the Mother over the wellbeing of the child has become a barrier to his ability to parent."

For instance, the court found that the father continued to disparage the mother, by alleging unfitness. The court also found that the father's actions related to the 2020 name change order were unjustified, and possibly fraudulent, warranting a "continued finding of abusive use of conflict." The court pointed to the father's conduct of calling Seattle Public Schools in an attempt to thwart the mother's plan to enroll the child in an educational program. The father expressed

no concerns about the quality of the program and the court found that his actions were simply "vindictive." The court also found that the father's language related to this conflict ("I warned her") suggested that he was "attempting to intimidate or control" the mother and undermine her decision-making authority under the parenting plan.

Thus, the court expressly found, based on conduct *subsequent* to the 2019 trial, that equal residential time with each parent was no longer in the child's best interests, stating:

> Father has not been able to follow the spirit or the letter of the 2019 Parenting Plan authorizing Mother to make all major decisions, which was intentionally designed to reduce the high-conflict dynamic between Mother and Father. The legal name change of the child is especially worrisome. Father's presentation during trial appeared controlling or manipulative. Father does not seem to understand the impact of his behavior on the child **despite** completing the treatment/classes ordered in the 2019 Parenting Plan. An additional RCW 26.09.191 finding for an emotional/physical problem is supported. The child's best interests will be served by a residential schedule that reduces the Father's parenting time to (1) decrease the stress on the child created by the parents' inability to co-parent, (2) further reduce opportunities for Father's abusive use of conflict, and (3) enable the child to successfully navigate fulltime preschool and kindergarten at the school selected by Mother; and by maintaining sole decision-making for Mother with some additional clarification around known areas of conflict[.]

These findings demonstrate that .191 restrictions were imposed based on conduct that occurred both before *and after* entry of the 2019 parenting plan. Again, the father does not specifically address these findings or challenge the evidence in the record that supports them. The findings, verities on appeal, amply

support the court's discretionary decision under RCW 29.09.191(3) and RCW 26.09.260(4) to limit the father's residential time.

C. Supervised Residential Time

The father next claims substantial evidence does not support the court's decision to temporarily impose supervised residential time. According to the father, there is no evidence to support a finding that he "would likely abduct" the child and therefore, there was no valid basis to require supervision. But the court made no finding that abduction was likely, or even probable. Instead, the court found an "actual risk" of abduction, i.e., a possibility. The court identified that possibility based on a combination of factors: (1) continued abusive use of conflict and emotional impairment, (2) legally changing the child's name, under circumstances that could amount to fraud, and (3) sole possession of identity documents for the child in a different name. To address the possibility, the court required the father's residential time to be supervised until he undertook specific actions outlined in the parenting plan to ensure that the child's name was changed to reflect both parties' wishes and that both parties possessed the same identity documents for the child.

The father does not address the combination of factors that the court relied upon. Instead, he maintains that his conduct related to the name change order created no risk because, (1) he justifiably believed that the mother agreed to change the child's full name and (2) the use of a disputed notarized letter to obtain the order, even if "invalid," did not amount to fraud. But on appellate review, we do not reevaluate the credibility and weight or persuasiveness of the evidence.

See Snyder v. Haynes, 152 Wn. App. 774, 779, 217 P.3d 787 (2009) ("We defer to the trial court's determinations on the persuasiveness of the evidence, witness credibility, and conflicting testimony."); In re Marriage of Murray, 28 Wn. App. 187, 189, 622 P.2d 1288 (1981) (appellate courts are reluctant to disturb decisions involving custody and child welfare in light of the "trial court's unique opportunity to personally observe the parties."). Such deference is particularly appropriate here where the court made specific findings as to the father's continued "feelings" about the mother, which were summarized as "demeaning, insulting and derogatory," based upon his opening statement.

The father argues that the juvenile court's .191 findings could not support its decision to impose a supervision requirement because only "outdated information" supports those findings. We have already rejected this argument. More importantly, the father fails to recognize that the court had discretion to limit his residential time solely based on the .191 findings. In other words, even if we were to conclude the finding of a risk of abduction was an abuse of discretion, the father still failed to address the evidence supporting the findings of abusive use of conflict and emotional impairment and that is fatal to his challenge to both limitations (reduced time and supervision) on his residential time.

## D. Constitutional Right to Parent

Finally, the father argues that by ordering the parties to add the father's surname to the child's birth name, which neither party proposed, the court violated his constitutional right to autonomous parental decision-making.

The Due Process Clause of the Fourteenth Amendment protects a parent's right to "autonomous decision making" in child rearing. Am. Legion Post No. 149 v. Dep't of Health, 164 Wn.2d 570, 599, 192 P.3d 306 (2008). This means that parents have the fundamental right "to make decisions concerning the care, custody, and control of their children." Troxel v. Granville, 530 U.S. 57, 66, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000).

The father cites no authority supporting his position that, in resolving a disputed issue of the minor child's legal name, the court's decision implicated the constitutional right to parental autonomy. See DeHeer v. Seattle Post–Intelligencer, 60 Wn.2d 122, 126, 372 P.2d 193 (1962) (when a party cites no authority in support of a proposition, we may assume counsel has found none). It does not appear that any Washington case has held that fundamental parental constitutional rights encompass selecting the legal name of one's child. And, as a general matter, provisions of parenting plans that allocate and divide parental rights and responsibilities and do not implicate parental constitutional rights. See King v. King, 162 Wn.2d 378, 385-88, 174 P.3d 659 (2007) ("[F]undamental constitutional rights are not implicated in a dissolution proceeding."); Momb v. Ragone, 132 Wn. App. 70, 77, 130 P.3d 406 (2006) ("[N]o case has applied a strict scrutiny standard when weighing the interests of two parents."). On the contrary, "a parenting plan that 'complies with the statutory requirements to promote the best interests of the children' does not violate a parent's constitutional rights." Katare v. Katare, 175 Wn.2d 23, 42, 283 P.3d 546 (2012) (quoting In re Marriage of Katare v. Katare, 125 Wn. App. 813, 823, 105 P.3d 44 (2004)).

Notably here, we cannot say that both parents oppose retaining the mother's surname as she has not filed a cross appeal or otherwise raised any objection. The father fails to establish a violation of his constitutional rights, abuse of discretion, or other legal error.

Affirmed.

_Díaz, J._

WE CONCUR:

_Birk, J._